312 Ga. 702
FINAL COPY

S21A1245.  MILLER v. THE STATE.

McMILLIAN, Justice.

Keontay Miller appeals his convictions for malice murder and other crimes arising out of the shooting death of Tellis Fort.[1] Miller asserts on appeal that the evidence presented at his trial was insufficient as a matter of constitutional due process to support the

---

[1] Fort was killed on May 14, 2015, and in August 2015, a Crisp County grand jury indicted Miller and Conardo Dennard for one count of malice murder (Count 1), one count of felony murder (Count 2), one count of aggravated assault (Count 3), and two counts of possession of a firearm during the commission of a felony (Counts 4 and 5). Miller was separately charged with two counts of possession of a firearm by a convicted felon (Counts 8 and 9). Miller was tried separately from Dennard, who is not a party to this appeal.

At a trial conducted from February 22 through February 24, 2016, a jury found Miller guilty on all counts. In March 2016, the trial court sentenced Miller to life imprisonment without the possibility of parole for malice murder; a five-year term of imprisonment for each count of possession of a firearm during the commission of a felony, to run consecutively; and a five-year term of imprisonment for each count of possession of a firearm by a convicted felon, to run concurrently. Miller's other convictions were either merged or were vacated by operation of law.

Miller filed a timely motion for new trial on March 18, 2016, which was amended through new counsel on March 15, 2018. After a hearing, the trial court denied the motion as amended on April 16, 2018. Miller timely filed a notice of appeal on May 16, 2018; the case was docketed to the August 2021 term of this Court and submitted for a decision on the briefs.

verdict and that there were direct and irreconcilable conflicts in the evidence and contradictions between the testimonies of witnesses at trial, which require a new trial. These contentions are without merit although we conclude that the trial court committed two merger errors at sentencing.

Viewed in the light most favorable to the jury's verdict, the evidence showed that on the evening of May 14, 2015, Fort and a friend worked out together at a local gym. Fort's friend testified that he left Fort at the gym around 9:30 p.m. At around the same time, a witness walking past Fort's house saw a person standing behind the house "peek in and peek out," and then retreat from view. About 40 minutes later, at 10:12 p.m., police received a call from Fort's neighbor, who reported that she and her adult son heard multiple gunshots fired nearby. Fort's neighbor also told the 911 dispatcher that her son had witnessed two "boys" in white clothing running down the street. Another witness testified about hearing the sound of sirens and then seeing two males — one wearing red shorts and a white shirt and the other wearing blue jeans and a white shirt —

2

running away. This witness testified that one of the males was about 6 feet, 2 inches tall, and the other was 5 feet, 9 inches tall. These descriptions were consistent with Miller, who stands 5 feet, 9 inches, and his co-defendant, Conardo Dennard, who stands 6 feet, 1 inch.

The responding officer arrived just minutes after the 911 call was made and discovered Fort lying on the ground, next to the driver's side door of his vehicle near his house. The officer testified that Fort had a gunshot wound and was covered in blood, Fort's wallet and keys were found next to his body, and the pocket of his shorts was turned inside out. Fort died subsequently, and the medical examiner testified that the cause of Fort's death was a gunshot wound to his chest.

Police canvassed the area and discovered two small-caliber pistols stacked on top of each other and hidden in a yard behind Fort's house. One was a .25-caliber semi-automatic pistol with a magazine, and the other was a .380-caliber semi-automatic pistol with a magazine. The crime scene investigator also found a .380-caliber cartridge case next to the front passenger side of Fort's

vehicle.

On May 15, the morning after Fort's death, Miller's mother brought Miller and Dennard to the Cordele Police Department because she had heard Miller's name mentioned in connection with the shooting and wanted to "clear his name." Police interviewed Miller and Dennard and obtained cell phone numbers and DNA samples from both men. Miller and Dennard individually told police that on the previous night they were together at the home of their friend Bertha Jackson, also known as "Peaches," around 9:00 p.m., and that they stayed at Jackson's mobile home for the remainder of the night.

However, phone records showed that Dennard's cell phone was pinging off cell towers around the area where Fort's house was located from 9:18 to 10:17 on the night of the shooting. At 11:08 p.m., Dennard's number sent a text message to Jackson's phone that read: "Dis red come pick us up please man." (The State presented evidence that Miller's nickname is "Red.") Miller's phone had no activity from 8:05 p.m. to 10:31 p.m., but made numerous calls from 10:31 p.m.

4

until 11:10 p.m. — all of which pinged off cell towers in the city of Cordele, in a radius where Fort's house is located, and *not* off the tower near Jackson's home. Miller's phone made a call at 1:19 in the early morning of May 15, which did ping off the phone tower near Jackson's home.

An acquaintance of the co-defendants testified that, on the night of the murder, he received two phone calls from Dennard's number — at 11:18 and 11:27. After receiving the second call, this witness testified that he drove Miller and Dennard from the vicinity of the murder to Jackson's home. A witness who was living with Jackson during this time testified that Miller and Dennard arrived around 1:30 a.m. on May 15; Miller was wearing shorts and a white t-shirt, and Dennard was wearing blue jeans and a white t-shirt.

After giving statements to the police on May 15, Miller and Dennard left town and could not be located by the police. On June 3, officers from the Camden County Sheriff's Office found the two men in a motel room in St. Marys, Georgia, but they were not registered under either of their names. Both men were placed under arrest.

Miller and Dennard were then incarcerated in the Crisp County jail. Miller's cellmate subsequently gave investigators two letters written on notebook paper, which had Miller's and Dennard's fingerprints on them. One read, in part, "Peaches house around 10:25." The other, in relevant part, read:

> I sold both of my pistols . . . to a boy . . . in Atlanta. I shot one time in the air with the .380 to show him that it work . . . . Me and Conardo [Dennard] and Stefon went to Peaches' house around 10:30. We get a ride by Jay, and that was all we did.

The State argued that, taken in tandem, the letters were evidence of the pair attempting to get their stories straight about the night of Fort's murder and to explain why Miller's DNA would be on the murder weapon.

Additionally, the State submitted into evidence screenshots taken from Miller's Facebook page. One screenshot featured a photo, posted on May 5, 2015, showing Miller with what appears to be the butt of a semi-automatic pistol sticking out of his pocket. The jury also watched a video of Miller and Dennard, posted to Dennard's Facebook page on May 8, 2015, in which Dennard displays what he

6

calls his "pocket rocket," which appeared to be a semi-automatic small-caliber pistol.

The jury heard testimony that the bullet taken from Fort's autopsy and the cartridge case found near his vehicle were both fired from the .380 semi-automatic pistol found hidden near his house. The State's expert in forensic biology testified that she had determined to a "scientific certainty" that Miller's DNA profile was present on both the .25-caliber gun and the .380-caliber gun.

1. In his first enumeration of error, Miller argues that the State failed to present sufficient evidence to support each element of the crimes of malice murder, aggravated assault, and felony murder. However, Miller was not convicted or sentenced on the aggravated assault count or the felony murder count, so "his claims as to the sufficiency of the evidence supporting those counts are moot." *Blackshear v. State*, 309 Ga. 479, 482 (1) (847 SE2d 317) (2020). Thus, our review of the sufficiency of the evidence presented at trial is limited to the malice murder count. See id. "[T]he relevant question is whether, after viewing the evidence in the light most

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

As to the malice murder count, Miller contends that the State failed to present evidence of malice aforethought. To convict someone of malice murder under OCGA § 16-5-1, the State is required to prove malice beyond a reasonable doubt; however, "[t]he malice necessary to establish malice murder may be formed in an instant, as long as it is present at the time of the killing." *Benton v. State*, 305 Ga. 242, 244 (1) (a) (824 SE2d 322) (2019). It is for the jury to determine, from the facts and circumstances presented in evidence, whether a killing is malicious. See id.

One witness walking past Fort's house around the time of the murder saw a person standing behind the house, waiting, and then retreating from view. The State also presented multiple witnesses who testified about seeing two men, matching the description of Miller and Dennard, fleeing the scene of the shooting where Fort

8

was lying on the ground covered in blood from his gunshot wound. Cell phone records — as well as testimony from the witness who drove Miller and Dennard that night — placed the pair in the vicinity of the victim's home on the night of the shooting, rather than in the vicinity of Jackson's home (where Miller told police he was located at the time of the murder). Miller and Dennard left town and could not be located by police for over two weeks and, once arrested, wrote letters to each other in which they attempted to establish an exculpatory, coherent narrative of the night of the murder. Most significantly, Miller's DNA was present on both handguns found hidden near the victim's house, one of which was the murder weapon. We conclude that the evidence presented at trial was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Miller was guilty of the crime of malice murder. See *Benton*, 305 Ga. at 244 (1) (a) (evidence sufficient to support finding of malice murder where, among other things, appellant left the victim after shooting him); *Moran v. State*, 302 Ga. 162, 163 (1) (b) (805 SE2d 856) (2017) (appellant shot victim at a

9

close range as victim tried to escape, authorizing rational trier of fact to find evidence of malice); *Shockley v. State*, 297 Ga. 661, 663 (1) (777 SE2d 245) (2015) (even without direct evidence linking appellant to the shooting, circumstantial evidence viewed in the light most favorable to the jury's verdict was sufficient to support conviction for malice murder).

2. In a related enumeration of error, Miller contends that conflicts in the evidence and in witness testimony warrant reversal of the trial court's denial of Miller's motion for a new trial.

Miller relies on *Alvelo v. State*, 288 Ga. 437, 438-39 (1) (704 SE2d 787) (2011), for the proposition that, when assessing the weight of the evidence in Miller's motion for a new trial, the trial court was required to assess the credibility of witnesses. Miller argues that the trial court's failure to set aside the verdict and grant him a new trial was error because of discrepancies in the record and issues with witness credibility. However, the record demonstrates that the trial court in this case expressly exercised its authority to sit as a "thirteenth juror" and to consider the weight of the evidence

10

as well as the credibility of witnesses. Compare id. at 439. "'Whether to grant a new trial based on OCGA § 5-5-21, i.e., that the verdict is strongly against the evidence, is [an issue] that is solely in the discretion of the trial court, and the appellate courts do not have the same discretion to order new trials.'" *Allen v. State*, 296 Ga. 738, 741 (2) (770 SE2d 625) (2015) (citations omitted).

Instead, this Court reviews the trial court's refusal to grant a new trial under the standard established in *Jackson v. Virginia*, rather than "reweigh the evidence presented at trial." *Davenport v. State*, 311 Ga. 667, 669-70 (1) (859 SE2d 52) (2021). See also *Williams v. State*, 287 Ga. 199, 200 (695 SE2d 246) (2010) ("'This Court does not reweigh evidence or resolve conflicts in testimony. It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citations and punctuation omitted)). As explained in Division 1, a rational jury was authorized to weigh the evidence, credit the testimony of the witnesses, and to find Miller guilty of malice murder.

3. Finally, even though neither party raises a merger error on

appeal, we have identified two such errors in Miller's sentencing. See generally *Dixon v. State*, 302 Ga. 691, 697 (4) (808 SE2d 696) (2017) ("[A]n exercise of our discretion on direct appeal to correct a merger error that harms a defendant (but of which he has not complained) may avoid unnecessary habeas proceedings and thereby promotes judicial economy.").

One of Miller's convictions for possession of a firearm during the commission of a felony (Counts 4 and 5), which were based on the two firearms used in the shooting, should have merged because, after proper merger of the other counts, only malice murder remained as the predicate felony. Thus, only one conviction for possession of a firearm during the commission of a felony under OCGA § 16-11-106 (b) was permitted. See *Stovall v. State*, 287 Ga. 415, 422-23 (696 SE2d 633) (2010) (Nahmias, J., concurring specially) (when malice murder was the only predicate felony after merger, only one conviction was permitted under OCGA § 16-11-106 (b), "regardless of the number of firearms involved"). Similarly, one of the convictions for possession of a firearm by a convicted felon

(Counts 8 and 9) should have merged because "OCGA § 16-11-131 (b) is unambiguous and permits only one prosecution and conviction for the simultaneous possession of multiple firearms." *Coates v. State*, 304 Ga. 329, 331-32 (818 SE2d 622) (2018). See also *Martin v. State*, 306 Ga. 538, 546 (7) (832 SE2d 402) (2019) ("[T]he gravamen of the offense is the general receipt, possession, or transportation of firearms by convicted felons, rather than the specific quantity of firearms received, possessed, or transported." (citing *Coates*, 304 Ga. at 331)).

For these reasons, we affirm Miller's conviction for malice murder, vacate his convictions for possession of a firearm during the commission of a felony and for possession of a firearm by a convicted felon, and remand the case for the trial court to resentence Miller on only one count of possession of a firearm during the commission of a felony and one count of possession of a firearm by a convicted felon. See, e.g., *Dukes v. State*, 311 Ga. 561, 572 (4) (858 SE2d 510) (2021).

*Judgment affirmed in part and vacated in part, and case remanded with direction. All the Justices concur.*

Decided October 19, 2021.

Murder. Crisp Superior Court. Before Judge Chasteen.

*Larry M. Johnson*, for appellant.

*Bradford L. Rigby, District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General*, for appellee.